UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA     *      CRIMINAL DOCKET

VERSUS                   *      NO. 25-111

HENRI MILTON VASQUEZ     *      SECTION: MAG, DIV. 5

### DEFENDANT'S RESPONSE TO
### GOVERNMENT MEMORANDUM ON PROBABLE CAUSE

In anticipation of the May 13 evidentiary hearing set before this Court, the defendant, Henrí Milton Vasquez, submits this response to the government's "Memorandum Regarding Title 8, United States Code, Section 1306(a)."[1] As explained herein, the single § 1306(a) charge against Mr. Vasquez is unsupported by probable cause and must be dismissed.

### SUMMARY

Mr. Vasquez is one of six noncitizens recently charged in this district with violating 8 U.S.C. § 1306(a), an obscure misdemeanor provision of the Alien Registration Act that has been largely dormant since the 1940s.[2] In these novel § 1306(a) prosecutions—filed in quick succession between April 17 and April 24—the government alleges that each charged defendant "being an alien required to apply for registration and to be fingerprinted in the United States, did willfully fail or refuse to file an application for such registration." *See* Rec. Doc. 1. This references § 1302 of

---

[1] *United States v. Josue Alejandro Guerrero*, No. 25-cr-96, Rec. Doc. 7 (E.D.La. May 6, 2025).

[2] *United States v. Juan Carlos Castro-Ignacio*, No. 25-cr-94 (E.D.La. Apr. 17, 2025) (dismissed for lack of probable cause); *United States v. Osborn Nash Bodden Welcome*, No. 25-cr-95 (E.D.La. Apr. 18, 2025) (dismissed for lack of probable cause); *United States v. Josue Alejandro Guerrero*, No. 25-cr-96 (E.D.La. Apr. 21, 2025); *United States v. Arnol Reyes-Galindo*, No. 25-cr-101 (E.D.La. Apr. 22, 2025); *United States v. Cristian Joel Hernandez-Barohona*, No. 25-cr-110 (E.D.La. Apr. 24, 2025) (dismissed due to removal); *United States v. Henrí Milton Vasquez*, No. 25-cr-111 (E.D.La. Apr. 24, 2025).

the Alien Registration Act, which imposes a "duty" on noncitizens present in the United States for at least 30 days to "register" and be fingerprinted. The related criminal provision, § 1306(a), creates a Class B misdemeanor for "[a]ny alien required to apply for registration and be fingerprinted . . . who willfully fails or refuses to make such application." When charged with this offense, all six defendants already were in civil Immigration and Customs Enforcement (ICE) custody pending removal. As a result, they must be transported from ICE custody in Jena to the federal courthouse in New Orleans for each court appearance—a trip that takes two days each way.

Notably, for decades, this 1940s-era "duty to register" that the government suddenly seeks to enforce was essentially defunct and abandoned. Indeed, since the 1950s, there has been no way for many noncitizens like Mr. Vasquez to register at all. And the "registration application" that the government alleges these defendants now failed to submit did not exist as a valid means to register until April 11, 2025. On that date, without notice and comment, the Department of Homeland Security (DHS) implemented an administrative rule that purported to create a new, online and English-only registration form, Form G-325R, that previously did not exist.[3] This apparent effort to resurrect an outdated, wartime "universal registration regime," including the G-325R form, has already been challenged in D.C. Federal Court on the grounds that the rule violates the Administrative Procedure Act and is "incoherent." *See Coalition for Humane Civil Rights v. U.S. Dept. of Homeland Security*, *et al.*, No. 25-cv-943, Rec. Doc. 1 (D.D.C Mar. 31, 2025). Nonetheless, immediately following the

---

[3] "Alien Registration Form and Evidence of Registration," 90 Fed. Reg. 11793 (Mar. 12, 2025).

rule's April 11 effective date, federal prosecutors began to file criminal charges against noncitizens—many already in ICE custody and pending deportation—for "willfully" failing to register under § 1306(a).

As described herein, the § 1306(a) charge against Mr. Vasquez is unsupported by probable cause and must be dismissed. *First,* the government's Memorandum makes clear that it charged Mr. Vasquez without regard to whether—much less evidence giving rise to probable cause—that he *willfully* failed to register, as § 1306(a) expressly requires. Indeed, the government does not even attempt to argue that it has evidence that Mr. Vasquez knew he had a duty to register with immigration authorities, had or was aware of a means of doing so, and intentionally violated this purported duty. Recognizing that defect, the government argues instead that § 1306(a) requires no such evidence. That view disregards explicit legislative history on this very point, the clear structure of the statute, and the basic requirements of the law that the government now seeks to enforce *en masse.* Each makes unequivocally clear that "willfully," as used in § 1306, means the voluntary and intentional violation of a subjectively known legal duty. Certainly, the law's *mens rea* does not permit the government to automatically charge and convict every person who entered this country unlawfully, regardless of defendant-specific circumstances, as the government now argues. Its claims to the contrary make clear that it misapprehended the statute's elements when it charged Mr. Vasquez and, as a result, did does not have the requisite evidence to support probable cause.

*Second,* the government downplays a related defect in these hurried

prosecutions: Until last month, it was *impossible* for Mr. Vasquez to "register" at all. Thus, the government's argument that Mr. Vasquez *willfully* failed to register does not grapple with the reality that, once Mr. Vasquez was present in the country and until April 11, 2025, there was no form available for him to use to register. And once G325-R became available, there is no evidence he knew he needed to fill it out (online and in English) or even knew of its existence.

For either (or both) reasons, the government plainly lacks requisite probable cause to proceed with the single § 1306(a) charge against Mr. Vasquez.

## RELEVANT BACKGROUND

### *The Alien Registration Act*

The Alien Registration Act (also known as the 1940 Smith Act) was passed during World War II as a national security measure, intended to sus out and remove subversive foreign enemies living within the United States. *See* Alien Registration Act of 1940, 76 P.L. 670, 54 Stat. 670; *see also* Jonathan Weinberg, *Demanding Identity Papers*, 55 Washburn L.J. 197, 203 (2015) (collecting historical sources). As one proponent explained at the time, the law was "a measure of self-defense" against enemies waging war against the United States via "fifth columns," i.e., foreign enemies entering the United States "to organize espionage, sabotage and subversive movements." Weinberg, *supra* (quoting 6 Cong. Rec. 9032, 9032-33 (1940) (statements of Rep. Hancock, Rep. Smith, and Rep. Hobbs)). To that end, the law made it a crime to "advise, or teach the duty, necessity, desirability, or propriety of overthrowing . . . government in the United States by force or violence," and provided for deportation

4

of any noncitizen who had ever been affiliated with such a subversive organization. *Id.* (quoting Alien Registration Act of 1940). Relevant here, the law also contained rules and, until now, rarely prosecuted criminal offenses related to "registration" of noncitizens present in the United States. Specifically, the Act imposed a duty for noncitizens present in the United States for longer than 30 days to register. Those who "willfully failed" to do so were subject to misdemeanor criminal penalties. *Id.*

The former Immigration and Naturalization Service (INS) established the Alien Registration Division to administer noncitizen registration. The agency established clear and easy-to-access registration through post offices. Upon filling out a general registration form provided at a local post office, the noncitizen was issued form AR-3—a registration receipt that itself conferred no immigration status or benefit. *See* U.S. Citizenship & Immigration Services (USCIS), *Policy Manual*, *available* https://perma.cc/Q87R-AX7Z. About five million people registered in this way, following "an elaborate Department of Justice publicity campaign" educating the public about the new requirements, the system for complying, and the benefits of doing so. Weinberg, *supra*, at 204. As a part of that effort, the Attorney General encouraged noncitizens to register over radio broadcast, assuring them that those with "irregularity connected with their entrance" would "receive all consideration" for immigration relief if they registered. Nancy Morawetz & Natasha Fernández-Silber, *Immigration Law and the Myth of Comprehensive Registration*, 48 U.C. Davis L. Rev. 141, 157-58 (2014) (quoting U.S. Attorney Gen., Speech Over the Broadcasting Facilities of the Columbia Broadcasting System Station WJSV: Alien Registration

and Democracy 3-4 (Dec. 21, 1940)).

There is extensive legislative history on the meaning and intent of the criminal misdemeanor created to punish those who willfully failed to follow that readily available and well-known process. Those discussions stressed that the law was only concerned with *willful* failure to register—not failure to do so due to lack of knowledge or understanding of the requirement. As one proponent explained: "Hundreds of thousands of aliens in this country will gladly comply with the provisions of this bill. From aliens of that type this country has nothing to fear; but those who are going to resort to fraud, and *willfully and knowingly refuse to register*, certainly should be dealt with more harshly[.]" 76 Cong. Rec. 8344 (statement of Sen. Russell) (emphasis added). Thus, the law was enacted with the clear intent that criminal penalties for not registering were reserved for those who acted willfully—meaning, with both *awareness* of their duty to register and *with intent to violate this duty* and/or defraud the government in doing so.

In fact, lawmakers raised this very issue in discussing how or if the term "willfully" relates to the term "failure," illustrating clear intent on this point:

> Mr. BROWN: Mr. President, I should like to make an inquiry of the Senator from Texas. I do not really know what the term "willful failure" means. It seems to me that the two words are contradictory. It seems to me that if a man tries to do something and fails to do it, it could not be called a willful failure.
>
> Mr. CONNALLY: It would not be.
>
> Mr. BROWN: It seems to me that language something like this—as I hastily put it together—would cover the situation: Any alien applying for registration and to be fingerprinted, who *with knowledge of such requirements*, fails or willfully refuses. Refusal contains in it the meaning of the word "willful"; but it seems to me that "failure" is

something with which the will does not have very much to do. It seems to me the language could be made somewhat clearer.

Mr. MILLER: Mr. President, if the Senator will look at the bill on page 13, he will find in line 18, and also in line 21, and running through the entire section, that the expression "willfully fails" also means "willfully refuses." *Of course, a man cannot willfully refuse to do something about which he does not know anything. I believe the whole context of the section will meet the objection or suggestion made by the Senator. . . .*

Mr. CONNALLY: Let me suggest to the Senator from Michigan that to my mind "willfully," in law means with an evil intent, with an improper purpose. It is wholly distinguishable from "willingly." It means with some improper purpose and some illegal intent. I think it will be found that the law dictionary so defines it.

Mr. BROWN. Mr. President, what is really meant here, it seems to me, is that the alien, *with knowledge of the fact that there is such a requirement, fails to appear and be registered.*

76 Cong. Rec. 8344 (emphasis added).

The term "willfully" was described similarly by a Senator advocating for deportation as an additional consequence for those who willfully fail or refuse to register: "This provision says 'willfully refuses.' We would not punish for willfully refusing a man *who did not file any application because he did not know about the necessity of doing it*." 76 Cong. Rec. 8344 (statement of Sen. Russell) (emphasis added); *see also id.* (further reasoning that the provision applies to someone who "willfully flout the law of the land and says, 'I, *with full knowledge of the facts*, refuse to register'" (emphasis added)).

In other words, the legislative history of § 1306(a)—both the law's purpose and the explicit discussion of its scope and meaning—made unequivocally clear from the onset that "willfully" requires both a person's subjective awareness of their legal duty to register and their voluntary and intentional choice to violate that duty and break

the law. The Supreme Court even referenced this legislative history as central to understanding the law's meaning shortly after its passage, observing that aliens "can only be punished for *wilful* [sic] failure to register." *Hines v. Davidowitz*, 312 U.S. 52, 73 (1941) (emphasis added). The Court explained: "That the Congressional decision to punish only wilful [sic] transgressions was deliberate rather than inadvertent is conclusively demonstrated by the debates on the bill." *Id.* at n.36. And, notably, when Congress re-codified this provision into the Immigration and Nationality Act (INA) in 1952, it made no change to the strict *mens rea* required of the failure-to-register crime. *Compare* 82 P.L. 414, 66 Stat. 163; 82 Cong. Ch. 477, § 266(a) (1952), *with* 76 P.L. 670; 54 Stat. 670; 76 Cong. Ch. 439, § 36(a) (1940). Thus, Congress gave no indication that it intended to change (much less dilute) this central *mens rea* element.

### *The Abandonment of Wartime Registration*

Although § 1306(a)'s *mens rea* is clear, the law's "registration" system became increasingly convoluted and inaccessible in the years following World War II. Notably, the task of filling in and implementing the details of § 1302 registration was outsourced to agency regulations from the onset. As a result, the law's meaning and substantive requirements always have been dependent on the underlying regulatory scheme that happens to be in place at any given time—a scheme that quickly devolved into a complex and torturous web of outdated and nonsensical directives.

Almost immediately following World War II—and the passing of the national security threat motivating noncitizen registration—INS began to dismantle its short-lived, wartime universal registration efforts. That included eliminating the Alien

Registration Division and canceling registration through post offices—with the agency amending its regulations in 1957 to delete any reference to post offices and providing instead that noncitizens could be registered by "[i]mmigration officers and any officer or employee of the United States selected by the Commissioner." *See* "Registration of Aliens in the United States: Forms and Procedure," 22 Fed. Reg. 9765, 9806 (Dec. 6, 1957). In 1960, that provision too was removed—meaning, one could not simply register through an immigration official anymore—and the regulations eliminated use of a general registration form entirely. *See* "Alien Registration," 25 Fed. Reg. 7180, 7180-81 (July 29, 1960).

In place of a general form and standardized registration process, post-war regulations began to designate a smattering of preexisting immigration documents— used for other purposes and generally available only to noncitizens with legal status—as the only permissible "registration forms" for § 1302 purposes. *See* "Registration and Fingerprinting of Aliens in Accordance with the Alien Registration Act," 1940, 15 Fed. Reg. 579-80 (Feb. 2, 1950). That list—codified in the Code of Federal Regulations—ultimately designated eleven specific forms as permissible for § 1302 registration and, for each form, described the accompanying class of individuals who could submit the documents to be considered "registered." *See* 8 C.F.R. § 264.1(a). None are registration forms *per se*, but instead forms used for other purposes that, once obtained, bestow upon the noncitizen the status of "registered" under § 1302 and its accompanying regulations. In other words, registration is an incidental benefit. For example, air and ship crewmen arriving by vessel or aircraft

who are issued an "I-95 Crewman's Landing Permit" are deemed registered. *Id.*[4] Many of the forms are obscure, and the classes to which they apply exceptionally limited. *See, e.g.*, *id.* (designating "I-67 Inspection Record" issued to Hungarian refugees). At least one of the forms does not exist anymore. *Compare id.* (designating "I-181, Memorandum of Creation of Record of Lawful Permanent Residence"), *with* USCIS, *Policy Manual*, Vol. 7, Part L, Chap. 2 ("Form I-181 is no longer in use.").

As a result of this regulatory reality, since the 1950s, there has been no "registration form" for noncitizens like Mr. Vasquez, who entered the country without lawful status—and no designated process by which those noncitizens in particular could "register." Weinberg, *supra,* at 212. These gaps and peculiarities in the registration statute and its underlying regulations led even an expert in immigration law to opine: "That body of law, as administered today, is convoluted, confusing, and significantly incoherent." *Id.* at 197. Of course, this is not necessarily a problem so long as the government abides by Congressional intent that no one should be prosecuted unless failure to register was willful, meaning, "so long as [the government takes] for granted that a person [is] not bound by the registration requirement unless there [is] a registration document meaningfully available for him or her to submit to the government." *Id.* at 212.

### *The Sudden Emergence of "Failure-to-Register" Prosecutions*

Unsurprisingly, the Alien Registration Act's now-outdated misdemeanor

---

[4] Form 1-95 is presented "by the master or agent of vessels and aircraft arriving in the United States for non-immigrant crewmembers applying for landing privileges. . . . CBP Form I-95 serves as the physical evidence that a non-immigrant crewmember has been granted a conditional permit to land temporarily." U.S. Customs & Border Protection, "Crewman's Landing Permit (CBP Form I-95)."

provision proscribing *willful failure* to "register" has been largely dormant for 70 years. That changed last month, when federal prosecutors abruptly started filing § 1306(a) charges, including six in this district. This flurry of § 1306 prosecutions appears to arise from recent directives related to immigration-law enforcement.

First, on January 29, President Trump issued an executive order, which directed the DHS Secretary, in coordination with the Attorney General, to take action to: "Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of [8 U.S.C.1301-06]," "[e]nsure that all previously unregistered aliens in the United States comply with [8 U.S.C. 1301-06]," and "[e]nsure that failure to comply with the legal obligations of [8 U.S.C. 1301-06] is treated as a civil and criminal enforcement priority." Executive Order 14159, "Protecting the American People Against Invasion" (Jan. 20, 2025), 90 Fed. Reg. 8443 (Jan. 29, 2025). On February 5, Attorney General Pam Bondi issued a memorandum directing federal prosecutors, in relevant part, to "pursue charges relating to criminal immigration-related violations"—specifically identifying § 1306 for enforcement, though only "where supported by evidence, and consistent with applicable law." U.S. Attorney General, "General Policy Regarding Charging, Plea Negotiations, and Sentencing" (Feb. 5, 2025).

DHS immediately recognized the problem with these directives. As the agency explained, the very class of individuals targeted for prosecution—i.e., those present in the country without authorization—"had no direct way to register and meet their obligation under INA 262." USCIS, "Alien Registration Requirement,"

https://www.uscis.gov/alienregistration (last reviewed May 12, 2025). Thus, in March, DHS published an Interim Final Rule ("IFR") creating a new general registration form, Form G-325R—the first such form since the 1950s. *See* "Alien Registration Form and Evidence of Registration," 90 Fed. Reg. 11793, 11795-96, 11800 (March 12, 2025). The IFR explained: "Following the issuance of [the] Executive Order, DHS reviewed the registration regulations at 8 CFR part 264 and determined that it would be appropriate to designate a general registration form in addition to those already identified in the regulations. . . . Aliens who have entered without inspection and have not otherwise been encountered by DHS lack a designated registration form." *Id*. Thus, the agency explained: "This IFR fills the gaps in the regulatory regime by prescribing a registration form available to all aliens regardless of their status, in addition to the other forms already listed." *Id*.

Without the benefit of notice and comment, that rule went into effect on April 11. Less than a week later, the government began filing criminal charges alleging willful failure-to-register by noncitizens, many already in ICE custody and awaiting removal proceedings. In one case, the prosecuted noncitizen had been arrested at 7am on the morning the new rule went into effect.[5]

## DISCUSSION

The rushed § 1306(a) prosecution against Mr. Vasquez lacks probable cause and must be dismissed. *First*, the meaning of "willfully" as used in § 1306(a) is clear: the government must have evidence that a person was aware of their duty to register

---

[5] *See Welcome*, No. 25-cr-95, Rec. Doc. 10, at 44 (E.D.La. May 1, 2025) (probable cause hrg. tr.).

and intentionally violated that duty. And, yet, it does not even attempt to argue that it has probable cause to support that requirement—and it doesn't. *Second*, in addition to misapprehending the willfulness requirement, the government also misapprehends the practical reality of this long-defunct alien registration scheme. Indeed, its theory of this case depends on its allegation that Mr. Vasquez willfully "failed to register" when, as the agency tasked with administering the registration regime recognizes, there was not even a way for him to do so until April 11. That too eliminates any willfulness in his alleged "failure" to register. Each of these grounds—both considered together and independently—mandates dismissal.

## I.    Section 1306(a) criminalizes "willful" failure to register, meaning inaction is proscribed only if a person is subjectively aware of their duty to register and intentionally violates that duty.

Notably, the government never argues that there is probable cause that Mr. Vasquez was aware of his duty to register, knew of how to do so, intentionally did not do so, or even *could* do so before April 11. Instead, the government seeks to avoid those obvious defects by arguing that "willfully" does not mean what Congress said it means. Though not providing its own concrete theory of the word's meaning, the government urges that, because Mr. Vasquez entered this country without legal authorization, he is automatically guilty of willfully failing to register as well. That view is incorrect—it violates the plain text of the statute, is inconsistent with the statutory structure, misapplies caselaw discussing the willfulness *mens rea*, and wholly ignores what Congress said when it passed this law.

In its memorandum, the government muses that the meaning of the term

"willfully" "is often dependent on the context in which it appears," but then fails to analyze the "context" of 8 U.S.C. § 1306 and, accordingly, never clearly articulates its understanding of the statute's *mens rea* requirement. *See* Gov't Memo. at 7 (quoting *Bryan v. United States*, 524 U.S. 184, 191 (1998)); Gov't Memo. at 8 & n.5 (discussing "various attempts at defining 'willful'" in general). An analysis of the text, structure, history, and purpose of the statute at issue here, however, provides a clear answer: In order to prove that a defendant "willfully fail[ed] or refuse[d] to make such application or to be fingerprinted," in violation of § 1306, the government must prove that he had subjective knowledge of the statutorily-created registration duty, yet voluntarily and intentionally chose to violate it by failing or refusing to make an application as provided for by regulation.

An analysis of the broader statutory and regulatory structure—which the government omits from its discussion—is key to understanding § 1306's penalty provision. Relevant here, the statutory regime does three things: (1) establishes a legal duty to "apply for registration and to be fingerprinted"; (2) grants authority to the Attorney General (and later the DHS secretary) to promulgate regulations for such registration and fingerprinting; and (3) creates a criminal penalty for "[a]ny alien *required* to apply for registration and to be fingerprinted in the United States who *willfully fails* or refuses to make such application or to be fingerprinted."

First, § 1302(a) describes a legal "duty" applicable to noncitizens:

It shall be the duty of every alien now or hereafter in the United States, who (1) is fourteen years of age or older, (2) has not been registered and fingerprinted [pursuant to the visa application process], and (3) remains in the United States for thirty days or longer, to apply for registration

and to be fingerprinted before the expiration of such thirty days.

Second, § 1303 and § 1304 provide the regulatory authority to create a process for noncitizens to comply with that duty—including both general authority "to prepare forms for the registration and fingerprinting" and specific authority to "prescribe special regulations and forms for the registration and fingerprinting" of certain classes of aliens, including "aliens of any other class not lawfully admitted to the United States for permanent residence":

> [T]he Attorney General is authorized and directed to prepare forms for the registration and fingerprinting of aliens under section 1302 of this title.

8 U.S.C. § 1304(a).

> Notwithstanding . . . [§] 1302 of this title, *the Attorney General is authorized to prescribe special regulations and forms for the registration and fingerprinting of* (1) alien crewmen, (2) holders of border-crossing identification cards, (3) aliens confined in institutions within the United States, (4) aliens under order of removal, (5) aliens who are or have been on criminal probation or criminal parole within the United States, and (6) *aliens of any other class not lawfully admitted to the United States for permanent residence.*

*Id.* § 1303(a) (emphasis added).

Third, § 1306(a) provides criminal penalties for willful failure to comply:

> Willful failure to register. Any alien required to apply for registration and to be fingerprinted in the United States who willfully fails or refuses to make such application or to be fingerprinted, . . . shall be guilty of a misdemeanor and shall, upon conviction thereof, be fined not to exceed $1,000 or be imprisoned not more than six months, or both.

Thus, the statutory text creates and defines a highly specific crime. In defining the class to which the crime applies (those "required to apply for registration") and the criminal conduct itself (the *actus reus*) as "fail[ure] or refus[al] to make such

15

application or to be fingerprinted," the statute penalizes a failure or refusal to comply with a statutorily-created legal duty—more specifically, the duty to make an application promulgated by the government pursuant to § 1303 and § 1304 in order to comply with the legal duty created by § 1302. And the statute defines a *mens rea* of "willfully" as an element of the offense—meaning, a person must know about the legal duty to register and intentionally fail or refuse to comply via making such application. In other words, the crime is not merely the status of being unregistered. Rather, as the title of the sub-section puts it, the crime is "*willful failure* to register" by those "required" to do so by the § 1302 regulatory scheme.

To prove that a defendant acted "willfully," "the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994). Further, to prove a defendant "willfully" violated a legal duty established by a technical statutory or regulatory regime—like the regime at issue here—the government must prove the "voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991); *see also United States v. Granda*, 565 F.2d 922, 925-26 (5th Cir. 1978) (explaining, in analyzing a currency reporting statute, that "the term[] . . . willful require[s] proof of the defendant's knowledge of the reporting requirement and his specific intent to commit the crime"). This is a heightened *mens rea* standard that "requires the Government to prove [1] that the law imposed a duty on the defendant, [2] that the defendant knew of this duty, and [3] that he voluntarily and intentionally violated that duty." *Cheek*, 498 U.S. at 201. And this means that, for § 1306(a), ignorance of the law—*i.e.*

16

lack of knowledge of the duty to apply for registration as provided for by regulation, *see* §§ 1302-04—*is* an excuse, because the government must prove a defendant's subjective knowledge of the duty to prove that he or she violated it "willfully." *See id.* at 199-201. Congress said exactly that when the law was passed.[6]

That is critical in the context of immigration law, which is highly complex—described by one circuit as "King Minos's labyrinth in ancient Crete." *Lok v. Immigr. & Naturalization Serv.*, 548 F.2d 37, 38 (2d Cir. 1977). Indeed, "the Tax Laws and the Immigration and Nationality Acts are examples [] of Congress's ingenuity in passing statutes certain to accelerate the aging process of judges." *Id.*  In fact, the provision at issue here, alongside the accompanying regulations set forth in the C.F.R., is so complicated that it currently requires a fifteen-plus-question screening survey to determine whether or not an individual must submit a registration form at all. *See* USCIS, "Alien Registration Requirement," https://www.uscis.gov/alienregistration. Considering this  complexity, Congress could not have intended to prosecute "innocent mistakes" made due to the complexity of immigration law—and Congress did not so intend. *See Cheek*, 498 U.S. at 199-200.

To avoid this, the government tries to move the goal posts, urging that "illegally entering the United States—and not informing immigration officials—is not a highly technical matter." Gov't at 8. But the government did not charge Mr. Vasquez with improper entry and avoidance of inspection by immigration officers—a separate

---

[6] That clear legislative history—among other things—easily distinguishes this statute from the firearm reporting statute at issue in *Bryan*, where the Supreme Court noted an absence of proof of Congressional intent to employ a heightened *mens rea* standard. *Bryan*, 524 U.S. at 196 (noting that the legislative "history is too ambiguous to offer petitioner much assistance.").

criminal offense. *See* 8 U.S.C. § 1325 (prohibiting "enter[ing] . . . the United States at any time or place other than as designated by immigration officers" and "elud[ing] examination or inspection by immigration officers"). Instead, it charged Mr. Vasquez with failing to comply with the complex § 1302 registration scheme after he remained in the country for more than 30 days. Moreover, contrary to the government's suggestion, "informing immigration officials" of one's presence is not a proscribed means of registering under § 1302—and hasn't been since the 1950s. *See* "Alien Registration," 25 Fed. Reg. 7180, 7180-81 (July 29, 1960) (removing regulations permitting noncitizens to register through "[i]mmigration officers and any officer or employee of the United States selected by the Commissioner.").

Further, as confirmed by the legislative history discussed above, proof of subjective knowledge in this context "makes sense because the failure to [register], when one is without knowledge of the [registration] requirement, must be classified as a 'nonfeasance' as opposed to a 'misfeasance.'" *See Granda*, 565 F.2d at 926. "Since the purpose of all law, and the criminal law in particular, is to conform conduct to the norms expressed in that law, no useful end is served by prosecuting the 'violators' when they have no knowledge of the law's provisions." *Id.* Therefore, "Congress, by adding the[] term[] ['willfully'], took this regulatory statute out of the ranks of strict liability type crimes." *Id.* Instead, as confirmed by the legislative history, Congress chose to include the term "willfully" to require subjective knowledge of the legal duty and intentional violation of the duty as elements of the offense.

While caselaw addressing § 1306 is limited (unsurprising, given the dormancy

of the statutory and regulatory regime), the caselaw there is on this obscure provision confirms that a *mens rea* incorporating awareness of a registration duty is required. For example, in *United States v. Zeid*, the Third Circuit affirmed a conviction because evidence "demonstrated that [the defendant] was fully aware he was an alien required to register and be fingerprinted but purposely and wrongfully refused to do so." 281 F.2d 825, 827 (3d Cir. 1960). Moreover, the court emphasized that the defendant "knew he was obliged to register and despite this he did not register" for a period of four months. *Id.* at 828.[7] Thus, like the definition of "willfully" in *Cheek,* the conviction for willful failure to make an application for registration upheld in *Zeid* required both (1) the defendant's subjective knowledge of the legal duty, and (2) his purposeful and wrongful refusal to comply.

In one of the only decisions addressing § 1306(a)'s willfulness standard, a magistrate judge in the District of New Mexico came to the same conclusion. *See United States v. Claudio-Becerra*, No. 08-cr-2305, 2008 WL 11451346 (D.N.M. Aug. 28, 2008). There, the court carefully examined possible interpretations of the word "willfully" and concluded that the legislative history clearly supported a "willful" standard requiring subjective knowledge of the legal duty. *Id.* at *3 (citing 86 Cong. Rec. 8346 (1940)). The court held:

> [W]illfulness is an essential element of the offense described in 8 U.S.C.
> § 1306(a), and that the term "willful" in 8 U.S.C. § 1306(a) means that
> Defendant must have knowledge of his duty to apply for registration and
> be fingerprinted under Section 1302(a) and must have deliberately
> failed or refused to apply for registration and be fingerprinted before he

---

[7] Notably, unlike today, the law and regulations in effect at the time of *Zeid* allowed for aliens to register in-person with immigration officers. *See* Weinberg, *supra*, at n.80.

can be convicted of this crime.

*Id.* at \*3.

The government argues, by contrast (and with little analysis), that "willfully" merely means "intentionally" and "not by mistake or accident" such that "[t]he defendant's knowledge that he committed the act is sufficient" to prove *mens rea*. Gov't at 8 (quoting *United States v. Kay*, 513 F.3d 432, 447 (5th Cir. 2007)). That is incorrect. Precedent is clear that when the term "willful" is used in a criminal statute, as it is here, "something more is required than the doing of the act proscribed by the statute." *United States v. Kerley*, 643 F.2d 299 (5th Cir. 1981) (quoting *Screws v. United States*, 325 U.S. 91, 101 (1945)); *United States v. Arditti*, 955 F.2d 331, 340 (5th Cir. 1992) (explaining that "*in common usage* the word 'willful' is considered synonymous with such words as 'voluntary,' 'deliberate,' and 'intentional,'" but that a different, heightened definition applies where "willful" is a substantive element of a criminal offense (emphasis added)).

The government's attempt to dilute the *mens rea* requirement is not only contrary to precedent but is further refuted by the text and structure of the statute. For example, the use of willful in subsection (b)—the provision immediately below § 1306(a)—creates a Class C misdemeanor for already-registered noncitizens who fail to notify the Attorney General of an address change. 8 U.S.C. § 1306(b). Unlike § 1306(a), that misdemeanor does *not* require willfulness. However, in the next breath, the same subsection states that any noncitizen convicted of failing to advise of an address change is subject to removal "unless such alien establishes to the satisfaction of the Attorney General that such failure was reasonably excusable *or*

*was not willful.*" *Id.* (emphasis added). Immigration courts have made clear that "willful" in § 1306(b) means "knowledge of the address reporting requirement and . . . willful failure to comply." *Matter of H-*, 20 I. & N. Dec. 693, 695 (BIA 1993). Thus, the government urges that a single term take on two meanings within the same statutory provision—an interpretive absurdity.[8]

Notably, much of the government's misapplication of willfulness caselaw stems from its confusion over what is (and isn't) the act that the statute makes criminal. Again, the government repeatedly suggests that a defendant violates § 1306(a) by "illegally entering the United States . . . and not informing immigration officials." Gov't Memo. at 8; *see also* Gov't Memo. at 9 ("The defendant acted with bad purpose when he snuck across the border, avoided a multitude of ways to enter the country legally, and concealed himself from detection by immigration authorities."). That argument is contrary to the statutory regime, which (1) creates a legal duty for aliens to register, regardless of means of entry or status, and (2) specifically penalizes willful failures or refusals to apply for registration and fingerprinting. The statute plainly does not penalize unlawful entry or unlawful presence, nor the mere fact of being unregistered. Indeed, as the Supreme Court has recognized, laws regulating alien *registration* serve a different function and have a distinct purpose from law regulating alien *entry*. *See United States v. Campos-Serrano*, 404 U.S. 293, 299-300 (1971).

And, of course, the statutory purpose and history of this law all fully corroborate the foregoing text and structure analysis, leaving no doubt about the

---

[8] *See* Justice Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012), at 170 (describing the "Presumption of Consistent Usage" interpretive canon).

correct meaning of "willfully" in § 1306. This registration regime was passed to locate foreign enemies seeking to undermine our national security during a time of war. As described extensively above, Congress expressly stated again and again that it was not interested in criminalizing those who do not happen to be registered for § 1302 purposes, but for whom there is no evidence of "knowledge of the fact that there is such a requirement." 76 Cong. Rec. 8344. But that is *exactly* what the government is now doing with this sudden wave of prosecutions—which pursue criminal convictions for indisputably *unknowing and unintentional* violations of this long-dormant statute and the law's obscure and highly complex regulatory regime. That is not what Congress intended, that is not what the statute's text allows, and the government should not be allowed to proceed any further as a result.

Finally, even if there *were* ambiguity as to the meaning of § 1306's "willfully" element (and there's not), this Court "would resolve any doubt in favor of the defendant" in accordance with rule of lenity principles. *See Ratzlaf*, 510 U.S. at 147-49 (explaining that rule of lenity would apply in event of ambiguity in meaning of a statute's use of "willfulness"). This Court need not resort to application of the lenity doctrine, however, because the statute is not genuinely ambiguous. Rather, analysis of the text, structure, history, and purpose of the statute make clear that the government must prove that the defendant had subjective knowledge of the registration duty and nonetheless voluntarily and intentionally violated it in order to prove that he "*willfully* fail[ed] or refuse[d] to make such application or to be fingerprinted." The government does not argue that it has that evidence—only that

it doesn't need it. The government is wrong, and, therefore, this charge is unsupported by probable cause and must be dismissed.

## II. The law did not provide Mr. Vasquez with a way to register until April 11, 2025.

The above ends the inquiry. But, as this Court already found, the fact that Mr. Vasquez did not have a way to "register" *at all* until April 11 also conclusively resolves the probable-cause question. *See Welcome*, No. 25-cr-95, Rec. Doc. 10, at 44 (E.D.La. May 1, 2025); *Castro-Ignacio*, No. 25-cr-94, Rec. Doc. 10 (E.D.La. May 1, 2025). There is no evidence that Mr. Vasquez willfully failed to register by not submitting a form that unavailable as a means to register until April 11 of this year.

As the government itself acknowledged in March, "a significant number of aliens present in the United States have had no direct way to register and meet their obligation under INA 262." USCIS, "Alien Registration Requirement," https://www.uscis.gov/alienregistration (last reviewed May 9, 2025). Indeed, until recently, USCIS's website indicated that there was not yet "a form and process to complete the registration requirement," advising people that "[o]nce the registration process is implemented, aliens will submit their registration . . . through their USCIS online account." *See* Ex. A (USCIS "Alien Registration Requirement" Page, updated Feb. 26, 2025). Thus, although there were several ways for aliens who originally entered lawfully to be considered "registered" within the meaning of § 1302—through their submission of other immigration forms—until very recently, there was no way for individuals who entered unlawfully to be registered at all.

Only in March of this year did the government begin the process for a rule

change to add a new means of applying to register—and it was not until April that
the rule became effective. *See* Dep't of Homeland Security, Doc 2025-03944, 90 FR
11793 (detailing rule, effective Apr. 11, 2025). The new form, G325-R, attached as
Exhibit B, was expressly designed to "fill the gaps in the regulatory regime by
prescribing a registration form available to all aliens regardless of their status, in
addition to the other forms already listed." *Id*. Moreover, although the form is now
technically available for submission, it can only be submitted online and in English.
And even if one knows where to find the form, one may still be led astray by USCIS
from filing it at all based on the confusing screening questionnaire on the USCIS
website, which is far from straightforward and contains highly complicated questions
that are difficult for laymen noncitizens to answer, particularly those not fluent in
English. *See* USCIS, "Alien Registration Requirement" Page.

Under these circumstances, the evidence does not establish probable cause
sufficient to allow this case to proceed. There is no evidence that Mr. Vasquez knew
he was required to register under 8 U.S.C. § 1302, nor that he voluntarily and
intentionally failed to fulfill this duty. Indeed, during the vast majority of his time in
this country, it was not even possible for him to register. And, even once the
government suddenly decided to make dormant § 1302 registration a priority, it filled
"gaps" in the regulatory scheme with more confusion: An online- and English-only
form that only became available on April 11, 2025. That, of course, in the absence of
other evidence, does not amount to willfulness. Certainly, it does not show that
Mr. Vasquez *knew* of the availability of the form in the few days following the rule's

effective date and formed the intent to willfully avoid registering using it.[9]

Because Mr. Vasquez had no way to register during the vast majority of his time in this country and because an English and online form to do so only became available as a means to register as of April 11, under any standard of willfulness, this charge lacks adequate probable cause. Indeed, the government cannot argue that Mr. Vasquez willfully violated this statute by failing to fill out a novel form that became available days before he was charged.

## CONCLUSION

For the above reasons, the Bill of Information should be dismissed as lacking probable cause following the May 13 evidentiary hearing.

Respectfully submitted this 12th day of May, 2025.

CLAUDE J. KELLY
Federal Public Defender

/s/Celia C. Rhoads
CELIA C. RHOADS
Assistant Federal Public Defender
500 Poydras Street, Suite 318
New Orleans, Louisiana 70130
Telephone: (504) 589-7930
Bar # NY 5317185
e-mail: celia_rhoads@fd.org

---

[9] The government appears to realize that knowledge of this hurriedly passed registration form matters in this prosecution. Indeed, it highlights what it suggests were public-education efforts, describing a "national and international ad campaign, which included targeted ads to reach illegal aliens in the interior of the United States." Gov't Memo. at 5. The government seems to suggest that noncitizens heard about registration requirements and therefore knew to abide by them. That, of course, would not matter if knowledge of § 1302's registration duty were irrelevant, as the government urges. In any event, the cited ad has nothing to do with registration. Instead, DHS Secretary Kristy Noem tells immigrants like Mr. Vasquez to "leave now." The government later references a press release, but that document quotes Secretary Noam from the same ad campaign stating only generally that she and President Trump "will enforce all immigration laws."

## CERTIFICATE OF SERVICE

I hereby certify that a that a true and correct copy of the foregoing document has been filed with the Clerk of the Court by using the CM/ECF System which will send a notice of electronic filing to all counsel of record on this 12th day of May, 2025.

/s/Celia C. Rhoads
CELIA C. RHOADS
Assistant Federal Public Defender